[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this highwwy [highway] condemnation case, the State on September 28, 1989, took an undeveloped 2.0 acre parcel of the plaintiff's land that borders a retail commercial development constructed on the remaining 2.65 acres of its land. The condemnation was related to the construction of the Central Connecticut Expressway, but it is not planned that any part of the highway will be constructed on the land taken, which is situated in Newington.
The 2.0 acre parcel bounds the existing retail development, known as 641 New Britain Avenue, on the east. The 2.65 acres on which that development was constructed were purchased by the plaintiff on May 4, 1987, at a stated price of $1,447,500, but costs of $1,121,050 for site work and fill to raise the elevation of the property, as well as other expenses, increased the total cost of that land to $2,568,550, or $22.25 per square foot (S.F). (Ex. 7, p. 15; Ex. L, p. 9). The undeveloped 2.0 acre parcel was purchased by the plaintiff from a different owner on July 8, 1987, at a total price of $100,000 and the resolution of some easement disputes with one of the parties to the sale who had held an option on the property. (Ex. L, p. 10). The highway department commissioner assessed the damages for the taking at $156,000 and deposited that sum, which was paid to the plaintiff, who has, nevertheless, appealed.
The plaintiff's appraiser, Joseph Perelli, in his report, (Ex. L), estimated the damages from the taking to be $840,000, using the capitalization of net income method of valuation. He testified, however, that this figure should be reduced by $176,200 because the original estimate of the cost of the proposed expansion of the retail development that the taking now precluded, had been revised by the plaintiff's architect from $281,000 (Ex. I) to $457,200 (Ex. N). If the related items of entrepreneurial profit and "soft costs" for financing and other fees, estimated by Perelli at 15% of construction costs, are added to the $175,200 change in the construction cost estimate, the result is a reduction of $201,480 in the original $840,000 estimate, or a revised damages appraisal of $638,520.
The state's appraiser, John Flint, using the comparative sales valuation method, arrived at $156,000 as CT Page 11279 his estimate of damages when he submitted his report (Ex. 7), using $24/S.F. as the unit value for the developable area of the land. The lack of any recent land sales in the general area of the subject property made it necessary for him to rely on three adjusted sales of land situated on the Silas Deane Highway in Wethersfield and Rocky Hill, not as commercially valuable a location as that of the subject property, which is located near the West Farms Mall. A planimeter measurement by Flint indicated that all but 26,000 square feet of the two acres taken by the state was classified by the town of Newington as wetlands, which could not be developed without a special permit that probably could not be obtained. The increment of value added to the existing retail development by the two acres taken at $24/S.F. for the developable 26,000 square feet was $624,000, to which Flint added $2,000 for the value of the remaining wetlands, for a total increase in value of $626,000. From this figure he deducted $470,000, his estimated cost of constructing a parking deck for 67 cars, and thus arrived at his damages estimate of $156,000.
At trial, however, Flint testified that additional information he had received on the cost of constructing a parking deck, or other parking expansion, and the necessity of a retaining wall, not included in his original calculations, had convinced him that the projected expansion of the existing development by utilizing the 26,000 square feet that he had assumed could be used for such a purpose, was entirely unfeasible. He referred to the testimony of Amerigo Scarpa, a professional engineer called by the state, who had estimated the cost of the site improvements needed for the retail expansion at $650,000 (Ex. 6) and of an additional 5,000 square foot building at $50/S.F. (including basement and above-ground floor), or approximately $250,000. Scarpa's total cost estimate of approximately $900,000 for the projected retail expansion was $430,000 greater than the $470,000 that Flint had used in his damages calculation. Flint testified that the increase in rental space to be added by the expansion would not justify its cost. He concluded that the highest and best use of the property taken would have been for some recreational use and opined that the land taken had a value of only $10,000. CT Page 11280
Presumably because the state had not done so, the plaintiff introduced into evidence the appraisal report (Ex. M) of Frank Bisson, an appraiser employed by the highway department, who inspected the property on the same date as Flint, August 9, 1989, about seven weeks before the taking. His planimeter measurement of the useable area of the two acres taken was $19,000/S.F. Using $21.50/S.F. as his unit value, his estimate of the increment of value attributable to the useable 19,000 S.F. and the wetlands was $358,000, but he deducted $218,000 for the cost of a parking deck for 31 cars, resulting in a net damages figure of $140,000. Bisson's analysis, except for differences in the useable land area of the parcel taken, in the unit value used, and in the parking deck cost is similar to that of Flint. Both of them used the same comparative sales in arriving at unit values of $21.50/S.F. (Bisson) and $24 (Flint).
After viewing the property, examining the exhibits and weighing the widely divergent testimony of the expert witnesses, the court has concluded that the plaintiff's proposal to use the 26,000 square feet of non-wetlands included in the 2.0 acres taken by the State to expand the parking area sufficiently to allow construction of a 5,143 square foot building was not practically feasible on the condemnation date. The court finds the estimate of the cost of the project presented by Scarpa of $650,000 (Ex. 6) for site improvements and approximately $250,000 for the cost of the building far more credible than the revised estimate (Ex. N) prepared by the plaintiff's expert of $251,480 for site work and $205,720 for the building. If the 15% allowance for entrepreneurial profit and "soft costs" added by Perelli to his construction cost estimate is applied to Scarpa's estimate of $900,000, the total cost of the project would be $1,035,000.
Furthermore, no allowance has been made for the fact that the leases to the two tenants occupying the building at the time of the condemnation contain clauses providing that any additional construction by the landlord "shall not unreasonably interfere with the tenant's use and enjoyment of the leased premises or the parking thereto." (Ex. C). Another clause prohibits any additional construction "which causes a reduction in the . . . access to the premises." (Id.) The contemplated reconstruction of the eastern half CT Page 11281 of the parking area would probably interfere with the ability of those tenants to conduct their businesses. Some accommodation of the tenants would be necessary, probably in the form of a rent abatement during the construction period, estimated at two months by Scarpa.
Perelli estimated the net amount of operating income for the completed project at $677,855 and for the existing property "as is" at $532,296, a difference of $145,559. Applying a 12.5% capitalization rate to that figure indicates a value increase of $1,164,472 for the property. Subtracting the total estimated costs of $1,035,000 for the addition would result in a net increase in value of $129,472 after completion of the project. In view of the problems involving the tenants during the construction period, it is doubtful that a possible gain in value of that amount would induce anyone to embark on such an elaborate project as that proposed by the plaintiff. A rental abatement of two months would reduce the present annual operating income of $677,855 by one-sixth, or approximately $113,000. Litigation costs in relation to the dispute with the tenants might also be entailed.
The plaintiff purchased the 2.0 acre parcel slightly more than two months after acquiring the 2.65 acres used for the present development. As the photographs, maps and a view of the property indicate, the easterly half of the 2.65 acres was raised above the existing grade by depositing a great amount of fill to create relatively level terrain. A substantial amount of fill was placed within the 26,000 square foot non-wetlands area of the 2.0 acre parcel in order to provide lateral support for the eastern side of the existing parking lot. If the 2.0 acre parcel had been unavailable, the present parking area could not have been extended to about ten feet from the easterly boundary of the 2.65 acre piece without constructing a very costly retaining wall.
If the plaintiff's present proposal were practically feasible, the court is convinced that it would have been included in the initial construction project in 1987. The reconstruction of the parking area would require removal of much of the fill that was deposited originally to achieve the present grade. It would also necessitate removal and replacement of underground structures and repaving of the CT Page 11282 eastern portion of the parking area.
Although the court has rejected the plaintiff's approach to the valuation of the property taken, it must, nevertheless, reassess the damages for the condemnation. C.G.S. 13a-76. A less grandiose and less costly extension of the parking lot area might well have been feasible. It appears from the photograph (Ex. A), and the drawing (Ex. F), that some additional parking spaces could be created adjoining the existing 13 spaces, which extend along a line about 10 feet from the easterly property line. One or two of the present spaces would be lost to provide access to the additional parking. Some fill would be required to maintain the same elevation as the existing parking lot and also a retaining wall much smaller than that proposed.
A prospective buyer of the existing retail development could reasonable have assumed that the land taken would allow expansion of the parking area by six to twelve parking spaces without the costs entailed in reconstruction of the existing parking area and a retaining wall of the dimensions required by the plaintiff's proposal. Even if only six additional spaces could be created, it would allow the construction of 1,000 square feet of additional retail space under the Newington Zoning regulations, which would generate an increase in gross annual rental income of $30,000 at $30/S.F. Capitalization of this amount at 12.5% would result in a value increase of $240,000 less the cost of the improvements which the evidence provides no basis for estimating. A prospective buyer would undoubtedly have paid some amount for the possibility in 1989 that some modest expansion of the parking area was feasible or might become feasible in the future with a greater spread between rental rates and construction costs.
The applicable amount of damages is the additional amount that a prudent buyer of the present retail development would pay for ownership of the undeveloped 2.0 acre parcel. Based on a net annual operating income of $532,296, Perelli valued the present development at $4,260,000. One result of the condemnation is that the plaintiff no longer controls property which provides the lateral support for its remaining property, which is worth about $4,000,000. The photographs, as well as a view of CT Page 11283 the property, indicate that there is presently an erosion problem affecting the most easterly 50 feet of the area that was filled by the plaintiff. It is possible that, if this condition is not corrected in some manner, the erosion will eventually encroach upon the land adjacent to the existing parking lot and cause serious problems. The plaintiff would now require permission from the State to take preventive measures on the land it has condemned. Any prospective buyer of the remaining 2.65 acres would probably pay some additional amount to have control over what may happen to the 2.0 acres bordering his $4,000,000 investment.
The court, therefore, rejects Flint's revision of his original appraisal from $156,000 to $10,000 in his final testimony. The court has concluded that a reasonably prudent investor would be willing to pay an additional $200,000 or 5% of his investment for the possibility of a modest expansion of the retail development on the useable portion of the two acres, the retention of control of the land providing lateral support to the development, and the ability to prevent any use of the wetlands that a wetlands commission or the state might conceivably permit.
It is ordered that judgment enter for the plaintiff to recover of the defendant $200,000 as damages for the property taken. As the plaintiff has already received the $156,000 deposited by the commissioner, there remains a balance of $44,000 to be paid. Interest on this amount at a rate that is "reasonable and just" pursuant to General Statutes 37-3c is also awarded to the plaintiff. If the parties are unable to agree upon the amount of interest, the court will hold another hearing for that purpose. The plaintiff is also entitled to recover its costs pursuant to General Statutes 13a-77, including an appraisal fee of $3,000 which the court considers reasonable for the services of its appraiser.
David M. Shea State Judge Referee CT Page 11284